Allen, J.
William Cottrell, late of Henrico county, departed this life early in the year 1838, leaving a will dated the 7th January 1836, which was admitted to probat on the 9th July 1838. He had been twice married. By his first wife he had three daughters, all of whom had been married previous to the date of his will; two were then living, and the third had died, leaving two children. By his second wife, who survived him, he left seven children, all of whom were infants, and so continued down to the period when the decree in this case was pronounced. By the three first clauses in his will, the testator bequeathed a slave to each of the two married daughters, children of the first marriage; and a legacy of 100 dollars to each of the children of the third daughter. The fourth clause was in the following words: “I give to my present wife Susan and my children by her, my plantation on which I now reside, together with all my slaves not specified above,” (several articles of personal property particularly described,) “ all my plantation utensils, my household and kitchen furniture, and all the money; and the balance of my estate I wish sold, and all my just debts paid; and the remainder, if any, to be equally divided among all my children.” The present controversy grows out of a difference as to the extent of the devise and bequest contained in this fourth clause of the will; the subsequent provisions of the will having no bearing on the question.
The bill filed on behalf of the first set of children and the descendants of the one who had died, alleges *574 that the testator at the date -of his will and at his death, was seized of very valuable coal mines and a large coal field unexplored, covering in the whole ten acres of land, which were not a part of the plantation on which he resided, but had been for some time worked and leased as separate property, and was so leased at the death of the testator. These coal mines and coal field it is alleged, constituted his coal property, separated by bounds and fences from the plantation, and used and leased as separate property, which it was not his intention to devise to his widow and children of the second marriage, to the exclusion of those of the the first, who were equally dear to him. And it is contended that this coal property either passed under the residuary clause aforesaid, and should be sold and divided among all his children; or as to it he died intestate.
It is further alleged that the testator owned at the time of his death a considerable personal estate not described in the will, and liable to sale and distribution under the fourth clause of his will; and had large, sums of money due to him from private individuals, and from a company entitled the'“Savings Institution” in the city of Richmond; which money thus due, it is contended was not embraced by the words “ and all the money” given by the 4th clause to the widow and children ; but passed by the general residuary clause or by operation of law to all the children of the testator and their descendants.
The infants answered generally by guardian, submitting their rights under the will to the protection of the court. The widow and administratrix with the will annexed denies, in her answer, that the testator ever set apart any particular portion of his land as a coal field; he believed, as was the general belief, that all the land contained coal, though he had never worked but a small portion of it for coal, and that' *575 portion he never set apart as distinct property from the balance of his estate: That the land on which he died is all embraced in one plat, having on it seven ferent fields, separated by ditches and fences: That the field in which the coal shaft is sunk contains twenty-eight acres; that the same fencing and enclosure was round it long before a coal mine was opened, and has undergone no change; and that the claim to ten acres grows out of the circumstance that when he leased the pits the testator gave to the lessee the right to enclose a part of the field containing twenty-eight acres, for a garden, mule pound and clover lots; reserving to himself the right to use the surface of the residue of the field, and which he cultivated as part of his plantation. The answer denies that the coal pit was leased to any one at the death of the testator; and avers that the children of the first marriage were all grown and settled in life, and that considerable advances had been made to them; and that all the seven children by the second marriage were infants, five of them under ten years of age.
The only evidence concerning this branch of the case is found in the deposition and statement of Jesse Snead; from which it appears that he and another took a lease from the testator for five years, commencing on the first of January 1832 : That the land included in the lease was described by metes and bounds, being separated from the other lands of the testator by a ditch and fence enclosure; that the quantity of land rented was, he thought, about forty acres, the lessor reserving to himself the right to cultivate all the leased premises except so much as might be necessary for pit operations, clover lot and mule pounds, not to exceed ten acres: That the field in which the coal mines were had been enclosed for cultivation many years, and before the coal was discovered: That after the discovery of the coal, it had been wrought by the *576 testator himself until leased to the witness : That he gave notice, in the fall of 1835, of an intention to surrender the lease, and abandoned the possession in Feb’y 1836 : That no part of the field was cultivated during his lease, but thinks the testator sowed oats on the leased land in the spring of 1836. He furthermore estimates the value of the coal in the coal pit field at 5,000 dollars; and the plantation, exclusive of the coal contained in it, at 2,500 dollars.
Upon the hearing the court below held that the land containing the coal mines, passed by the fourth clause of the will by the description of “ my plantation on which I now reside,” to the widow and her children.
The intention of the testator must be gathered from the terms of the will, and by such lights as surrounding circumstances may throw upon the case; and little aid is to be derived from the construction of other wills. The cases referred to in the argument were all cases in which there were several tenements held by the testator, which were separate and distinct.
Thus in the case of Pullin v. Pullin, 11 Eng. C. L. R. 21, the testator held several distinct messuages in Islington, some of which were under mortgage, others not. The general descriptive words were large enough to have comprehended all his tenements in Islington; but having recited that they were under mortgage, the court held he intended to confine the extent of the Islington property he proposed to pass to the property under mortgage. So in the case of Parkin v. Parkin, 1 Eng. C. L. R. 119, there were two distinct unconnected tenements, one in, the other not in his occupation. The general description would have passed all his real estate at that place, but for the qualifying words then in his own occupation. He intended something by the use of these words, and in the language of Lord Hardwicke in Gascoigne v. Barker, 3 Atk. R. 8, where the testator does not make a certain definitive description, *577 it is very difficult not to construe the subsequent restrictive words as explanatory of the former. The same remarks will apply to the other cases cited. In most, if not all of them, there were separate and distinct tenements or tracts of land.
Where there are distinct tenements, there is something for the restrictive words to operate upon, so as to limit and confine the general description to the tenements referred to in the restrictive words. But in this' case the question is whether the testator had ever so separated the coal-pit field, or any part of it, from the rest of his plantation, as to show that when he referred to the plantation on which he then resided he meant to exclude the coal-pit field; and this depends upon the facts in evidence.
The whole of the land was at one time held, used and enclosed as part of his plantation prior to the discovery of coal. This discovery, according to the evidence of Snead, made no change in the occupation or possession up to the time of the lease; the proprietor merely altered his mode of enjoyment. Nor did his lease to- Snead separate the property from the residue of the plantation. Authority was given to raise the mineral within a certain boundary, with the right to the exclusive occupation of a portion of the surface not exceeding ten acres, but reserving the right to cultivate the residue of the land embraced within the boundaries of the lease : Thus- continuing to hold all the land as part of the same tract for cultivation, with an authority to the lessees to raise the coal, and to have the exclusive possession of so much of the surface as would be necessary to carry on the mining, operations. And it would seem probable, from the statement of the witness, that he did cultivate this coal field the year after the lease was abandoned-.
The case of Chamberlaine v. Turner, Croke Car. 129, comes nearer to this case than any of those re *578 ferred to. There the property was described as the ^oi;ise where A dwelleth at a place named. A was in of three rooms only, but the court held that ^le h°use passed. The house was an entirety and the terms were descriptive, not restrictive. And so • here, even if there had been different leases of the same character with the lease to the witness, there is nothing to show that the testator intended to break Tip his plantation into different holdings; or that, in describing it as the plantation on which he then resided, he intended to restrict the generality of the description to any particular part.
The other circumstances of the case repel the idea that the testator did not intend to comprehend the whole of the land by the terms he used. The evidence shows that the coal was more valuable than the land exclusive of the coal. The testator himself seems to have placed a high value upon it.
The framer of the will seems to contemplate a full disposition of all his estate, and a provision for all having claims upon him; and it would be unreasonable to suppose, under such circumstances, that he intended to die intestate in respect to what he probably regarded as the most valuable portion of his estate; or that he designed to comprehend it under the vague terms contained in the concluding paragraph of the 4th clause of the will in which he directs the balance of his estate to be sold, his just debts paid, and the balance, if any, to be divided, &c. He owed but few debts, as the accounts taken show; and he could not have felt a doubt about there being a balance to divide after the payment of his debts, if he had intended fo comprehend in this residuary clause the most valuable portion of his real estate. I think there was no error in the decree of the Circuit court in regard to this ’branch of the case.
The court further held that by the phrase “ all the money,” occurring in the fourth clause, the money of *579 the testator at the time of his death in the savings institution, as well as moneys found in the house, passed to the widow and her children, but not moneys due by bond, judgment, or in stocks or other securities.
The report of the commissioner shows that 115 dollars was found in the house of the testator at his death; that the administratrix received of the savings institution 1573 dollars 3 cents, and that she collected considerable sums on judgments. We can derive no aid in the construction of this clause by the state of the testator’s property. It was uncertain when he made his will what money he would have on hand or due to him by securities of any kind at the time of his death. We must ascertain by the will and its context what he intended by the phrase “ and all the money.” By the previous part of the paragraph he gives to his wife and children by her the plantation on which he now resides, all his slaves not specified before, four horses or mules as she may select, two yoke of oxen, five milch cows to be selected by her, one wagon and gear, one cart, and all his plantation utensils, his household and kitchen furniture, “ and all the moneyand the balance of his estate he wished sold and all his just debts paid, and the remainder, if any, to be equally divided among all his children. In this clause nothing precedes or follows the phrase “ and all the money,” which can limit of qualify the legal definition of the word “ money,” when used in a will. No locality is fixed ; it is not confined to money in the house, and everything which, according to the ordinary acceptation of language in the transactions of men, is treated and dealt with as money, will pass.
In 1 Roper on Legacies 282, it is said that the word “ money,” unaided by the context, will include cash, bank notes, money at the bankers, notes payable to bearer, &c., because they are not to be considered as choses in action, but money of the person in whose *580 possession they are. But choses in action, promissory notes not payable to bearer, government stock, &c. will not pass under the word money. Most of the cases on the meaning of this phrase were reviewed by the lord chancellor in the case of Parker v. Marchant, 19 Eng. Ch. R. 355, where it was held that the testatator’s balance at his banker’s passed under the words “ ready money.” In the cases of Carr v. Carr, 1 Meri. R. 541, and Devaynes v. Noble, Ibid. 528, Sir William Grant held that a balance at a banker’s would pass under the word debts. The chancellor reviews these and another case of the same character, remarking that it was justly held in those cases, that such a balance is, and may be recovered as a debt. The money is not to be returned in specie; the engagement is to be ready to pay an equal amount when called for; and therefore it was properly held that it passed under a bequest of debts owing to the testator, it being in point of law a debt, and there being nothing to restrain the operation of the words or to show a contrary intent. “ But that in the ordinary use of language money at a banker’s is considered as ready money. Everybody speaks of the sum which he has at his banker’s as money; my money at my banker’s is a usual expression.” So in the case of Vaisey v. Reynolds, 5 Russ. R. 12. The testator bequeathed to his wife his book debts, his “ moneys in hand,” and his stock in trade. Sir John Leach held that a balance at a banker’s could in no sense be considered as money on security; but in a reasonable sense it might be considered as money in hand; for it was to be ready when called for. In those cases the balances were upon ordinary banking accounts; and in the case of Parker v. Marchant, the fact was adverted to that it did not appear that any interest was payable upon them, or that they were subject to any limitation, restriction or condition. In every other respect a deposit with a savings institution *581 would seem to be a stronger case for treating it as money than at a private banker’s; for by the rules and regulations of such institutions the money is always be returned within a certain period after it is called for. It does not appear what were the regulations of this particular institution. But in the ordinary transactions of life we know that such deposits are not regarded as investments in the common acceptation of the term. The depositor consents to accept of a low rate of interest, because he regards it as a fund upon which he can always rely upon giving a short notice required for the convenience of the depositary. I think therefore there was no error in holding that the moneys of the testator at the time of his death in the savings institution passed to the widow and her children under the phrase “ all the money.”
It is assigned as error that the court so interpreted the will as to make the bequest to the widow and her children of all the money comprehend not only the money in the house or in bank, subject to the check of the testator, but also all the debts due to him. This seems to be a mistake, as by the decree moneys due by bond or judgment or in stocks or other securities, were decided not to pass to the widow and children by her. The passage before cited from Boper on Legacies shows that the word “ money” in its proper and ordinary sense, does not comprehend choses in action. In Hotham v. Sutton, 17 Ves. R. 319, Lord Eldon held that stock does not pass by the word “ money.”
The same proposition was laid down in Gosden v. Dotterill, 6 Cond. Eng. Ch. R. 495. That was a strong case for the application of the rule, for by excluding the stock there was not money enough to pay the legacies he had given, and an intestacy was created as to the bulk of the property. The master of the rolls had no doubt that it was the intention that the *582 stock should pass under the term money. But that it was settled that the term “ money” would not pass stock unless there is in the will some explanatory context. There is nothing in the context to indicate such intention here unless it he the provision directing the balance of his estate to be sold. But this is the ordinary expression used by testators in a residuary clause directing a sale and distribution of- the residuary estate, It may be satisfied by referring it to such portion of the estate as would be a proper subject of sale, and should' not of itself be construed as restricting the general words to perishable property the subject of sale. The testator intended that all his estate not specifically devised and bequeathed should pass by the residuary clause; that so much as was the proper subject of sale should be sold, and the proceeds, as well those arising from the sale as collected upon choses in action, should be distributed in the mode prescribed.
The master commissioner by his report allowed the appellants, Dabney and Snead, the hires of the slaves specifically bequeathed to their wives, with interest on the estimated hires. The administratrix excepted to so much of the report as debited her with hires of the slaves, and also for the charge of interest on the hires, they being estimated hires. The court properly overruled the exception so far as it respected the hires, deciding that the administratrix was properly charged with them, but sustained the exception as to interest on the hires upon the ground that they were estimated hires. According to the principles established in the cases of Cross’ curatrix v. Cross’ legatees, 4 Gratt. 257, and Rosser v. Depriest, 5 Gratt. 6, the administratrix being a fiduciary, was properly charged with the interest on the estimated hires; and the court erred in sustaining the exception to that extent. For this error the decree must be reversed with costs; but should be affirmed in all other respects.
*583 Daniel, Moncure and Samuels, Js. concurred in the opinion of Allen, J. >